IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THERESA COUNIHAN | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| ANDREW SAUL, Commissioner of | : | NO.  19-4884 |
| Social Security | : | |

## MEMORANDUM AND ORDER

ELIZABETH T. HEY, U.S.M.J.                          September 9, 2020

Theresa Counihan ("Plaintiff") brought this action pursuant to 42 U.S.C. § 405(g) to review the Commissioner's final decision denying in part her application for disability insurance benefits ("DIB").  For the reasons that follow, I conclude that the decision of the Administrative Law Judge ("ALJ") is supported by substantial evidence.

## I.    PROCEDURAL HISTORY

Plaintiff applied for DIB on September 21, 2015, alleging disability beginning on April 24, 2015, when she was involved in a motor vehicle accident.  Tr. at 92, 160, 191.[1] The application was denied initially, id. at 93-97, and Plaintiff requested an administrative hearing before an ALJ.  Id. at 98-100.  An administrative hearing took place on September 12, 2018.  Id. at 33-81.  On September 20, 2018, the ALJ issued an unfavorable decision, finding that Plaintiff was not disabled.  Id. at 15-27.  The Appeals Council denied Plaintiff's request for review on August 28, 2019, id. at 1-6, making the

---

[1]Plaintiff's date last insured is December 31, 2020, requiring her to establish that she became disabled on or before that date to qualify for DIB.  Tr. at 82, 191; see 20 C.F.R. § 404.101(a).

ALJ's September 20, 2018 decision the final decision of the Commissioner.  20 C.F.R. § 404.981.

Plaintiff commenced this action in federal court on October 18, 2019.  Doc. 1. The matter is now fully briefed and ripe for review.  Docs. 8-10.[2]

## II. <u>LEGAL STANDARD</u>

The court's role on judicial review is to determine whether the Commissioner's decision is supported by substantial evidence.  42 U.S.C. § 405(g); <u>Schaudeck v. Comm'r of Soc. Sec.</u>, 181 F.3d 429, 431 (3d Cir. 1999).  Therefore, the issue in this case is whether there is substantial evidence to support the Commissioner's conclusions that Plaintiff is not disabled.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and must be "more than a mere scintilla."  <u>Zirnsak v. Colvin</u>, 777 F.2d 607, 610 (3d Cir. 2014) (quoting <u>Rutherford v. Barnhart</u>, 399 F.3d 546, 552 (3d Cir. 2005)).  The court has plenary review of legal issues.  <u>Schaudeck</u>, 181 F.3d at 431.

To prove disability, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for . . . not less than twelve months."  42 U.S.C. § 423(d)(1).  The Commissioner employs a five-step process, evaluating:

---

[2]The parties have consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c).  <u>See</u> Standing Order, In RE: Direct Assignment of Social Security Appeal Cases to Magistrate Judges (Pilot Program) (E.D. Pa. Sept. 4, 2018); Doc. 5.

      1.     Whether the claimant is currently engaged in substantially gainful activity;

      2.     If not, whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to perform basic work activities;

      3.     If so, whether based on the medical evidence, the impairment meets or equals the criteria of an impairment listed in the "listing of impairments," 20 C.F.R. pt. 404, subpt. P, app. 1, which results in a presumption of disability;

      4.     If the impairment does not meet or equal the criteria for a listed impairment, whether, despite the severe impairment, the claimant has the residual functional capacity ("RFC") to perform her past work; and

      5.     If the claimant cannot perform her past work, then the final step is to determine whether there is other work in the national economy that the claimant can perform.

See Zirnsak, 777 F.3d at 610; see also 20 C.F.R. § 404.1520(a)(4).  Plaintiff bears the burden of proof at steps one through four, while the burden shifts to the Commissioner at the fifth step to establish that the claimant is capable of performing other jobs in the local and national economies, in light of her age, education, work experience, and RFC.  See Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 92 (3d Cir. 2007).

## III.   DISCUSSION

Plaintiff was born on May 3, 1979, and thus was thirty-five years of age at the time of her alleged disability onset date (April 24, 2015) and thirty-nine at the time of the ALJ's decision (September 20, 2018).  Tr. at 44, 82, 191.  She is five feet, four inches tall, and weighs between approximately 263 and 326 pounds.  Id. at 41, 195.[3]  Plaintiff

---

[3]Plaintiff testified that she weighed 263 pounds at the time of her administrative hearing, but had weighed as much as 326 pounds.  Tr. at 41.

lives in a house with her partner and one minor son who receives school services for

ADHD.  Id. at 44-45.  She obtained a doctorate in psychology and has work experience

as a psychologist.  Id. at 39-40, 196.

>   A.   **ALJ's Findings and Plaintiff's Claim**

In the September 20, 2018 decision under review, the ALJ found at step one that

Plaintiff has not engaged in substantial gainful activity since the alleged disability onset

date of April 24, 2015.  Tr. at 17.  At step two, the ALJ found that Plaintiff suffers from

severe impairments of cervical degenerative disc disease ("DDD") with bilateral

radiculopathy but worse on the left side, migraine headaches, obesity, and depression.  Id.

The ALJ also identified non-severe impairments of polycystic ovarian disease, gastro-

intestinal reflux disease ("GERD"), costochondritis, history of upper respiratory

infection, lumbar DDD, mild fatty liver, De Quervain's tenosynovitis, obstructive sleep

apnea, vitamin D deficiency, rash, and allergic rhinitis.  Id.  At step three, the ALJ found

that Plaintiff does not have an impairment or combination of impairments that meets the

Listings.  Id. at 18.  The ALJ then found that Plaintiff retains the RFC to perform

sedentary work, except that she can stand/walk for three hours in an eight-hour workday;

is prohibited from climbing ladders, ropes, or scaffolds, but can crawl, crouch, bend,

stoop, kneel, or climb ramps and stairs occasionally; requires a sit-stand option for two

minutes in place per hour, and a ten-minute break every two hours within a normally

expected employee break period; cannot do overhead work; can feel and perform fine and

gross manipulation with the dominant right upper extremity ninety percent of the time

and sixty-five percent on the left; is limited to no more than occasional interaction with

peers, the public, and supervisors, although no more than minimal supervision would be required after thirty days on the job; is limited to simple, routine tasks with no heights and dangerous machinery; and would be off-task twelve percent of the time and miss ten days of work per year. Id. at 20. The ALJ found that Plaintiff could not perform any past relevant work, id. at 25, and that considering Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. Id. at 26. As a result, the ALJ concluded that Plaintiff was not disabled. Id. at 27.

Plaintiff argues that the ALJ's opinion is not supported by substantial evidence because the ALJ (1) failed to properly explain why Plaintiff did not meet Listing 1.04A, (2) erroneously evaluated Plaintiff's RFC, and (3) improperly weighed the medical opinion evidence, and requests an award of benefits. Docs. 8 & 10. Defendant counters that the ALJ's opinion is supported by substantial evidence, and that a remand for award of benefits would be improper. Doc. 9.

### B.     Summary of the Medical Evidence

Plaintiff initially alleged disability due to neuritis, multiple cervical disc herniations, pain in the neck, back, shoulder, wrist, and jaw, migraine headaches, and concussion. Tr. at 195. The record also contains diagnoses of cervical and lumbar DDD, obesity, polycystic ovarian disease, GERD, costochondritis, De Quervain's tenosynovitis,

obstructive sleep apnea, and depression, among others.  See, e.g., id. at 529, 557, 1431-32, 1435.[4]

As noted, on April 24, 2015, Plaintiff was involved in a motor vehicle accident. Tr. at 236-54.  Hospital records reveal that she was the restrained driver of a vehicle involved in a moderate-speed front end collision with another vehicle, in which her airbags did not deploy, her vehicle did not overturn, she was not ejected, and she did not experience a blow to the head, neck pain, or loss of consciousness.  Id. at 237.  Plaintiff complained of moderate pain in her lower back, and on examination exhibited tenderness and spasm in her left-mid and lower lumbar area, no tenderness in her cervical, thoracic, or right lumbar areas, normal gait, and no motor or sensory deficits.  Id. at 237, 238.  X-rays of her lumbar spine indicated no evidence of lumbar compression fracture or listhesis.  Id. at 531.  She was prescribed Robaxin[5] and discharged with instructions to follow-up with her primary care physician.  Id. at 238, 242.

On May 1, 2015, Plaintiff sought follow-up treatment with Jeffrey Darnall, M.D., of Riddle Hospital Mainline Health, complaining that following the accident her pain got worse and she developed neck pain and headaches.  Tr. at 532.  According to Dr. Darnall, Plaintiff's problems included headache, neck pain, morbid obesity, polycystic ovarian disease, costochondritis, GERD, pain in joint, multiple sites, depression, and acute left

---

[4]As Plaintiff's claims are primarily concerned with the ALJ's consideration of her physical impairments, review of her mental health treatment will be less detailed than review of the physical treatment record.

[5]Robaxin (generic methocarbamol) is a muscle relaxant used to treat painful tightening of the muscles.  See http://www.drugs.com/methocarbamol.html (last visited July 7, 2020).

knee pain.  Id. at 529.  Upon examination, Plaintiff exhibited tenderness in her neck and

shoulder, consistent with whiplash.  Id. at 534.  Dr. Darnall ordered x-rays and prescribed

ibuprofen, Tramadol, and butalbital-acetaminophen-caffeine, to be taken as needed for

pain.  Id. at 534, 535.[6]

Plaintiff also sought follow-up treatment with orthopedist Kenan Aksu, D.O.  Tr.

at 557-65.  On May 4, 2015, Plaintiff reported having pain throughout the posterior

cervical spine, as well as headaches and numbness extending into her right forearm.  Id.

at 563.  Upon examination, Plaintiff exhibited restricted range of motion in her cervical

spine "in all planes," while her upper extremities were "neurologically intact with full

sensation in all dermatomes, no focal weakness, and 2+ reflexes throughout."  Id.  On

July 13, 2015, Dr. Aksu noted that examination of Plaintiff's left shoulder revealed "a

positive impingement sign."  Id. at 558.

On July 22, 2015, Daniel J. Kane, M.D., conducted an electrodiagnostic evaluation

of Plaintiff.  Tr. at 554-55.  Dr. Kane noted that since her car accident, Plaintiff

experienced "significant pain in her neck, which radiates into her left shoulder and down

her left hand," with shooting pains down her left arm and numbness in her right hand.  Id.

at 554.  The doctor noted Plaintiff's major complaint as severe headache, with unclear

---

[6]Tramadol is a narcotic-like pain reliever used to treat moderate to severe pain.
See https://www.drugs.com/tramadol.html (last visited July 7, 2020).  Butalbital-
acetaminophen-caffeine is a combination of butalbital, a barbiturate that relaxes muscle
contractions, acetaminophen, a non-opiate painkiller, and caffeine, a central nervous
system stimulant, used for treatment of headaches.  See
https://www.drugs.com/acetaminophen-butalbital-caffeine.html (last visited July 7,
2020).

thinking and difficulty processing information.  Id.  Although Plaintiff did not have a "true Spurling's maneuver" upon examination, Dr. Kane opined that "electrodiagnostic testing in conjunction with history and physical exam does reveal some chronic C6 nerve root irritation."  Id.[7]  Plaintiff's nerve conduction tests were "excellent," and she exhibited no evidence of complications such as neuropathy, nerve entrapment, or myopathy.  Id. at 554-55.  She exhibited limited cervical range of motion, with slightly decreased strength in her left triceps as compared to her dominant right side, and decreased sensation in her left arm and hand.  Id.

Plaintiff underwent a cervical MRI on July 16, 2015, revealing right paracentral disc herniation and pressing on the thecal sac at C3-4 and C4-5, and a large left paracentral disc herniation at C6-7 which displaced the left nerve roots and was approximating the cord.  Tr. at 285.  The impression was a misalignment, possibly reflecting muscle spasms.  Id.

Plaintiff had follow-up visits in August and September 2015, including with pain specialist Chee H. Woo, M.D., of the Center for Interventional Pain and Spine, on referral from Dr. Aksu.  Tr. at 263, 269, 272, 306, 311.  Plaintiff received a cervical epidural injection with fluoroscopy on August 13, 2015.  Id. at 273.  On September 11, 2015, during a follow-up visit for her cervical spine at Dr. Aksu's office, it was noted that Plaintiff's July 2015 MRI revealed a left-sided disc herniation at C6-7, and that the

---

[7]Spurling's maneuver is a test used to assess nerve root pain (or radiculopathy). See Paulus v. Colvin, Civ. No. 12-2122, 2014 WL 1513957, at *10 n.32 (M.D. Pa. Apr. 16, 2014) (citing http://www.medilexicon.com/medicaldictionary.php?t=90833 (accessed Oct. 18, 2011)).

subsequent epidural injection provided only short-term improvement.  Tr. at 557.

Plaintiff also complained of ongoing cognitive difficulties and left wrist pain, confirmed

by tenderness on examination and a positive Finkelstein's test.  Id.[8]  Plaintiff indicated

that she would receive a second cervical injection and pursue a neurology evaluation.  Id.

On September 17, 2015, Dr. Woo performed a left-side nerve root injection at C-5, 6 and

7, also with fluoroscopy.  Id. at 266.

On September 25, 2015, Plaintiff followed up at Dr. Woo's practice with

increased post-procedure pain.  Tr. at 261.  Upon examination, Plaintiff exhibited

tenderness in her neck and lower back, decreased sensation on the left side of C6-7,

normal gait, and reduced reflex (2/4) in her biceps.  Id. at 263.  Plaintiff also exhibited

full range of motion in her neck, 4/5 strength in her left biceps upon flexion, and 5/5

strength in all other muscle groups, including her left triceps.  Id.  On October 22, 2015,

Plaintiff received an additional cervical epidural injection.  Id. at 298.

On January 5, 2016, Plaintiff began a four-month course of chiropractic treatment

with Eugene Serafim, D.C.  Tr. at 566-611.  At her last visit on May 18, 2016, Plaintiff

reached maximum therapeutic benefit with fifty percent improvement, rated her pain as a

"3" on a ten-point scale, expressed concern that her daily activities and ability to walk

longer than twenty minutes were limited by pain, and complained that right neck pain

---

[8]Finkelstein's test is used to test for De Quervain's tenosynovitis, a painful
condition affecting the tendons on the thumb side of the wrist.  See
https://www.mayoclinic.org/diseases-conditions/de-quervains-tenosynovitis/diagnosis-treatment/drc-20371337 (last visited Sept. 4, 2020).

radiating to her left elbow was a "constant (75-100%) aching feeling" ever since her car accident.  Id. at 610.

On March 1, 2016, George Ondis, Ph.D., reviewed Plaintiff's mental health records as part of the initial disability determination and assessed whether she met the criteria for affective disorders.  Tr. at 86-87.[9]  Dr. Ondis opined that Plaintiff's medically determinable affective disorder caused mild restrictions of activities of daily living, mild difficulties in maintaining social functioning and concentration, persistence and pace, and no episodes of decompensation, and that she did not otherwise satisfy the criteria for a disabling affective disorder.  Id. at 86.  Dr. Ondis explained that although diagnosis of depression appears in the file, Plaintiff was not receiving mental health treatment and that her limitations appeared to be based on her physical issues.  Id.

On May 10, 2016, Plaintiff began a course of physical therapy that lasted more than five months.  Tr. at 687-957.  The initial evaluation set short-term goals of increasing strength in all planes, increasing range of motion of the cervical spine,

---

[9]The initial disability determination also contains a physical RFC completed by Hung Vo, SDM (single decision maker), who identified Plaintiff's medically determinable impairments as osteoarthritis and related disorders, and migraine.  Tr. at 87-88.  Mr. Vo opined that Plaintiff could frequently lift less than ten pounds and occasionally lift ten pounds, could stand/walk for two hours and sit for six hours in an eight-hour workday, could occasionally perform all postural activities, and had no other limitations.  Id. at 87-88.  However, Mr. Vo is not identified as a physician and does not have any medical consultant's code, and therefore his evaluation does not constitute medical opinion evidence.  See Saez v. Colvin, 216 F.Supp.3d 497, 506 n.1 (M.D. Pa. 2016) (SDM not entitled to evidentiary weight) (citing Yorkus v. Astrue, 2011 WL 7400189, at *4 (E.D. Pa. Feb. 28, 2001) (listing cases)); Glahn v. Berryhill, 2018 WL 3233367, at *14 (M.D. Mar. 29, 2018) (SDM not acceptable medical source) (citing 20 CFR § 404.1527(a)(2)).

decreasing pain by fifty percent in four weeks, and developing a home exercise program, with a long-term goal of returning to her prior level of functioning within eight weeks. Id. at 687.  During her visits, Plaintiff at times reported ongoing problems with pain and headaches, see, e.g., id. at 725 (09/30/16), 730 (09/27/16), while other times she reported no significant problems and that she could do more activities.  See, e.g., id. at 820 (07/06/16), 733 (09/23/16).

Meanwhile, in early May 2016, Neetu Reddy, M.D., of Penn Neurology, restarted Plaintiff on Wellbutrin for depression and added Flexeril for neck pain.  Tr. at 661-64.[10] Later that month, Plaintiff underwent a neurological evaluation with Fred Martin Weinblatt, M.D., also of Penn Neurology.  Tr. at 648-50.  Plaintiff reported improvement in her headaches with physical therapy and bupropion, despite continued headache symptoms.  Id. at 649.  Upon examination, Dr. Weinblatt found Plaintiff's cervical spine range of motion to be intact, and her Spurling's test was negative.  Id.  Plaintiff exhibited normal left arm and hand strength, without atrophy, with "very mild weakness distally in the left hand" and decreased pinprick sensation in lower cervical dermatomes.  Id.  Dr. Weinblatt told Plaintiff that "[i]ndications for spinal surgery would include intractable pain, severe neurological deficit or inability to carry out her normal lifestyle."  Id. at 650. The doctor opined that Plaintiff's difficulty with memory and focus were attributable to

---

[10]Bupropion (brand name Wellbutrin) is used to treat major depressive disorder ("MDD") and seasonal affective disorder.  See https://www.drugs.com/mtm/wellbutrin-sr.html (last visited July 7, 2020).  Flexeril (generic cyclobenzaprine) is a muscle relaxant used together with rest and physical therapy to treat skeletal muscle conditions such as pain and injury.  See www.drugs.com/flexiril.html  (last visited July 7, 2020).

post-concussion syndrome, and that she experienced post-traumatic headaches,

explaining that she was not prone to migraine headaches before the car accident and that

post-traumatic headaches are similar to migraines.  Id.  Dr. Weinblatt ordered a repeat

cervical MRI and nerve conduction tests, and prescribed topiramate daily and sumatriptan

as needed.  Id.[11]

     On June 20, 2016, Plaintiff underwent a repeat cervical MRI, which revealed

"moderate cervical spondylosis from C3 to C-4 through C7-T1," in addition to a

congenitally narrowed canal.  Tr. at 652.  The report did not indicate the presence of

nerve root displacement or compression at C6-C7.  Id. at 651-52.  A few days later she

underwent a nerve conduction test of her left upper extremity, yielding normal results

"without electrophysiological evidence of a myopathy, peripheral neuropathy, brachial

plexopathy, cervical radiculopathy, or other neuromuscular disorder."  Id. at 653.

     Plaintiff continued to see Dr. Weinblatt and others at Penn Neurology for her pain

and headaches.  In June and July 2016, she reported that her medications had improved

her symptoms with no side effects.  Id. at 656, 668.  In September 2016, Dr. Weinblatt

increased her dose of topiramate and noted that she was being seen at Penn Valley Forge

for pain management where she was receiving additional medications.  Id. at 674.

     Physical therapy progress notes from October 21, 2016, indicate that previously-

set goals related to increasing her cervical range of motion, decreasing her pain by fifty

---

[11]Topiramate (brand name Topomax) is a seizure medicine used to prevent
migraine headaches in adults.  See https://www.drugs.com/topirmate.html (last visited
July 7, 2020).  Sumatriptan (brand name Imitrex) is also used to treat migraine
headaches.  See http://www.drugs.com/sumatriptan.html (last visited July 7, 2020).

percent, and developing a home exercise program had been achieved earlier in the course of therapy, and that the goal of increasing her strength remained ongoing.  Tr. at 703. Plaintiff returned to physical therapy in late 2016 and early 2017.  Progress notes from January 2017 indicate that Plaintiff achieved her goal of a pain-free active range of motion in her cervical spine.  Id. at 1092, 1094.  Upon discharge from the latest round of physical therapy on February 1, 2017, Plaintiff reported "doing pretty well with pain," with some muscle weakness and decreased sensation, and no deficits in range of motion. Id. at 1109.

On January 23, 2017, Plaintiff began mental health treatment at Penn Psychiatric. Tr. at 1043-90.  Her initial complaints were anxiety, depression, and cognitive difficulties, and she reported feeling down, depressed or helpless more than half the days. Id. at 1087.  Plaintiff reported a history of depressive and anxious symptoms, and denied suicidal or homicidal ideation.  Id.  Upon mental status examination, Plaintiff appeared alert, cooperative, and fully oriented, and she exhibited fair concentration, constricted affect, and depressed mood.  Id. at 1088.  Plaintiff was assessed with Major Depressive Disorder ("MDD"), recurrent episode, mild, anxiety, and chronic pain due to injury.  Id. at 1089.  Plaintiff received social counseling related to diet and exercise, and psychotropic medication adjustment.  Id. at 1090.  Plaintiff returned to Penn Psychiatric approximately monthly for the remainder of the year, for management of her symptoms and medication adjustments.  Id. at 1043-1086.

On March 24, 2017, about three weeks after experiencing a house fire, Plaintiff sought treatment at Chester County Hospital ("CCH") Emergency Department for chills,

headaches, and diarrhea.  Tr. at 968-1005.  Plaintiff presented as positive for headaches and negative for back pain, and upon examination exhibited a normal mood and affect and normal range of motion.  Id. at 971.

On May 17, 2017, Plaintiff was evaluated at the start of another round of physical therapy at CCH, and her cervical and lumbar active range of motion was within normal limits.  Tr. at 1114.  She exhibited diffuse pain, most significant in the left upper shoulder region and left thoracolumbar paraspinal region, with spinal hypomobility, muscle strength deficits, and possible chronic left C6 radicular symptoms.  Id. at 1115.  Plaintiff continued physical therapy through February 2018.  Id. at 1114-1238.

On July 18, 2017, Plaintiff began treating with Roderick C. Spears, M.D., at Penn Specialty Care Neurology, for chronic headaches.  Tr. as 1288-90.  Plaintiff described having persistent headaches and from two -to- four migraines per month, decreased from fifteen per month before an increase in her Topomax dosage.  Id. at 1288.  Plaintiff denied muscle pain and weakness.  Id. at 1289.  Upon examination, Plaintiff exhibited intact memory, attention span, and concentration, normal gait and station, and normal muscle tone and muscle strength in her upper and lower extremities.  Id. at 1290.  Dr. Spears diagnosed Plaintiff with chronic migraine without aura, and intractable chronic post-traumatic headache.  Id.  Four months later, in December 2017, Dr. Spears began treating Plaintiff's headaches with Botox[12] injections.  Id. at 1297.  On March 19, 2018, Plaintiff reported that she continued to experience moderate headaches, and migraines

---

[12]Botox (generic onabotulinumotoxinA) is used to block nerve activity in the muscles.  See https://www.drugs.com/botox.html (last visited Sept. 4, 2020).

every eight -to- ten days, possible triggered by her period, dehydration, and possibly forgetting to take her medication on the weekends. Id. at 1305. Dr. Spears performed an additional Botox treatment during that visit. Id.

In October 2017, Plaintiff visited Natalia Vasiuk, M.D., of Penn Internal Medicine, following a dog bite. Tr. at 1389. Plaintiff reported that she was currently undergoing physical therapy for neck pain and that her migraines have been stable. Id. at 1390. Dr. Vasiuk found Plaintiff to have normal range of motion in her neck and a normal gait. Id. at 1392. Plaintiff reported knee pain in December 2017, worse on the right. Id. at 1401. Dr. Vasiuk noted Plaintiff's report that physical therapy "helped a lot" for her neck, and that Plaintiff was scheduled to have a Botox injection the following week for her migraines. Id. at 1401-02. Dr. Vasiuk recommended physical therapy for Plaintiff's knee pain and described her migraines as "not intractable." Id. at 1404.

On February 8, 2018, during a physical therapy re-evaluation, Plaintiff reported that she was "independent with all" activities, and that she was "able to walk around Disney World for 12 hours with occasional seated rest breaks . . . without increase in pain or [symptoms]." Tr. at 1245. During this period, she also reported during weight management visits that she walked her dog for up to forty-five minutes several days per week. Id. at 1475, 1483, 1485, 1493-94.

On April 18, 2018, Plaintiff returned to Penn Medicine with acute left shoulder pain attributed to her dog pulling the leash during a walk. Tr. at 1257. Upon examination, she exhibited limited range of motion secondary to pain, with no strength deficits and intact cranial nerves, and no indication of sensory or reflex loss. Id. at 1260.

She reported that radicular pain symptoms associated with her chronic neck pain "have mostly improved," and she requested a trigger point injection because injections had previously helped with her pain.  Id. at 1257.  At her next visit on May 23, 2018, her left shoulder pain had improved but was still hurting on flexion.  Id. at 1268.  During the first half of 2018, Plaintiff's prescriptions included bupropion (started on 02/09/18), Lidocaine (started on 04/18/18), and pregabalin (started on 05/23/18, replacing gabapentin).  Id. at 1432-33.[13]

On June 20, 2018, Plaintiff returned to Dr. Spears for another round of Botox injections for chronic migraines.  Tr. at 1313.  Plaintiff reported having a severe headache that lasted ten days after her previous Botox treatment, followed by intermittent, mild-to-moderate headaches thereafter.  Id.

On June 26, 2018, Plaintiff returned to Dr. Vasiuk for complaints of eye redness.  Tr. at 1431-38.  The doctor listed Plaintiff's diagnoses as including cervical radiculopathy, chronic neck pain, chronic cervical pain, depression, chronic obesity, De Quervain's tenosynovitis, chronic migraine without aura, intractable chronic post-traumatic headache, and obstructive sleep apnea.  Id. at 1435.  Plaintiff's ongoing medications included bupropion, butalbital-acetaminophen-caffeine, lidocaine, methocarbamol, naproxen, pregabalin, sumatriptan, and topiramate.  Id. at 1432-33, 1436.

---

[13]Lidocaine (brand name Lidoderm) is used to stop pain.  See http://www.drugs.com/cdi/lidocaine.html (last visited July 7, 2020).  Pregabalin (brand name Lyrica) is an anticonvulsant used to treat pain caused by fibromyalgia, or nerve pain caused by diabetes, herpes, or spinal cord injury.  See https://www.drugs.com/pregabalin.html (last visited July 7, 2020).

Plaintiff exhibited a normal range of motion in her neck, with no strength or other deficits, normal gait, and normal mood and affect.  Id. at 1437.  On July 13, 2018, during a physical examination prior to gastric bypass surgery, Plaintiff again exhibited a normal range of motion in her neck, and normal affect.  Id. at 1465.[14]

On August 14, 2018, Dr. Vasiuk completed a Physical RFC Questionnaire.  Tr. at 1440-43.  The doctor indicated that she had been treating Plaintiff for nine months, had diagnosed her with major depression, chronic pain, cervical radiculopathy and chronic migraines, and that her prognosis was fair.  Id. at 1440.  Dr. Vasiuk listed Plaintiff's symptoms as severe headaches, fatigue, pain in her neck and shoulders, chronic neck pain with radiculopathy, and depression/anxiety.  Id.   The doctor indicated that Plaintiff has 8/10 pain in her posterior neck, occipital area, frontal head, and both shoulders, and that the pain worsens with movement, lifting, sitting in one position, or standing.  Id.  Dr. Vasiuk identified clinical findings and objective signs as an MRI of Plaintiff's cervical spine showing C6-7 disc protrusion on the left and C5-6 central protrusion, and paracervical muscle spasm.  Id.

Dr. Vasiuk opined that Plaintiff's symptoms were severe enough to constantly interfere with the attention and concentration to perform even simple work tasks, and that she was incapable of even low stress jobs because stress triggers her migraines and pain.  Tr. at 1441.  The doctor opined that Plaintiff could walk two city blocks without rest or severe pain, could sit for ten minutes and stand five -to- ten minutes at one time, and

---

[14]Plaintiff testified that she had bariatric surgery shortly before the September 2018 hearing, tr. at 41, but records of the surgery do not appear in the administrative record.

could sit and stand/walk each for a total of two hours each in an eight-hour workday.  Id.

at 1441-42.  She would need unscheduled breaks and the ability to change positions.  Id.

at 1442.  Dr. Vasiuk opined that Plaintiff could never lift and carry more than ten pounds

(nothing is indicated as to her ability for the amount "Less than 10 lbs."), could rarely

look down or turn her head to the right or left, and could never look up or hold her head

in a static position.  Id.  The doctor further opined that Plaintiff could occasionally twist

or climb stairs, rarely stoop or crouch, and never climb ladders.  Id. at 1443.  Dr. Vasiuk

indicated that Plaintiff had greater limitations with reaching, handling, and fingering on

her left side – specifically, that she could use her right hand for grasping, turning or

twisting objects fifty percent of the time, her right fingers for fine manipulation fifty

percent of the time, and her right arm for reaching twenty percent of the time, and that

she could use her left fingers for fine manipulation only ten -to- fifteen percent of time,

could not use her left arm for any reaching, and could not use her left hand for any

grasping, turning or twisting objects.  Id.  The doctor opined that Plaintiff should avoid

noise, bright light, fumes, and exposure to pollen and hot/cold because these trigger

migraines, neck pain and shoulder pain.  Id.  Finally, Dr. Vasiuk opined that Plaintiff

would likely be absent from work more than four days per month.  Id.

On September 11, 2018, Dr. Spears completed a Physical RFC Questionnaire.  Tr.

at 1518-21.  Dr. Spears indicated that he had been treating Plaintiff since July 2017, and

that he saw her every three -to- five months.  Id. at 1518.  The doctor's diagnoses were

chronic migraine and intractable chronic post-traumatic headaches, and he assessed

Plaintiff's prognosis as fair to poor.  Id.  Dr. Spears listed Plaintiff's symptoms as

difficulty with reading and cognition, inability to work as a psychologist, severe migraines and headaches associated with light and sound sensitivity, nausea, and diarrhea, made worse by routine physical activities.  Id.  The doctor identified the location of Plaintiff's pain as in her head, both temporal and occipital, as well as her neck and shoulder, with the pain described as "pressure, sharp, heaviness, comes in waves, dull and achy."  Id.  Dr. Spears noted that Plaintiff experiences headaches daily, and migraines two -to- four times per month and lasting from two -to- four hours to seven days.  Id.  The doctor indicated that Plaintiff's headaches had been treated with two rounds of Botox injections, and that after the second round the headaches were no longer daily.  Id.  In the space to identify clinical findings and objective signs, Dr. Spears wrote that Plaintiff's neurological examination was normal.  Id.  In response to the question whether Plaintiff's impairments had lasted or were expected to last twelve months, Dr. Spears checked the box "no."  Id.

Dr. Spears opined that Plaintiff's depression affects her physical condition, that her symptoms are severe enough to occasionally interfere with the attention and concentration to perform even simple work tasks, and that she is incapable of performing even low stress jobs.  Tr. at 1519.  The doctor opined that Plaintiff could walk approximately two blocks without rest or severe pain.  Id.  She could sit for one hour and stand for fifteen minutes at one time, and she could sit and stand/walk each for less than two hours each in an eight-hour workday.  Id. at 1519-20.  Plaintiff would need to change positions and take unscheduled breaks, the latter occurring two or three times per week after which she would not be able to return to work.  Id. at 1520.  Dr. Spears opined that

Plaintiff could lift and carry less than ten pounds rarely, and never more than ten pounds. Id. She could rarely look up or down, occasionally turn her head to the right or left, and frequently hold her head in a static position. Id. Plaintiff could rarely twist, never crouch, stoop or climb ladders, and occasionally climb stairs. Id. at 1521. She has no limitations with reaching, fingering, or handling. Id. Dr. Spears opined that Plaintiff would have good days and bad days, and that she would likely miss four days per month of work. Id.

### C.   Other Evidence

At the September 12, 2018 administrative hearing, Plaintiff described the April 24, 2015 car accident and resulting symptoms, including immediate back pain followed by neck pain and concussion symptoms. Tr. at 41. Plaintiff testified that she can lift her arms with pain, and that she experiences radiculopathy worse on her non-dominant left side, which prevents her from lifting anything with her left arm. Id. at 48-49, 67. Her left hand will shake if she lifts things like milk, and therefore she must use both hands to lift and pour. Id. at 52. She has difficulty reaching forward and grasping objects, causing her to drop things. Id. at 59. She experiences pain from her neck, down her back and mainly into her left leg, describing everything as "tight." Id. at 53. She has headaches every day, with "intense pain" about ten days per month, accompanied by nausea, diarrhea, light sensitivity, irritability and sadness. Id. at 57-58. Sometimes she goes several days without a bad headache, and sometimes a bad headache will last four days. Id. at 65-66. She experiences dizziness, particularly after getting up quickly from a seated position or when bending over while shopping. Id. at 58-59. She has difficulty

using her right wrist due to De Quervain's tenosynovitis, for which she has received injections.  Id. at 60, 67.  She has difficulty sleeping and received a c-pap machine on a trial basis, but it made her feel claustrophobic and she does not like anything on her face. Id. at 61-62.  Plaintiff testified that her eight-year-old son is "really active" and "[h]ard to control," and that he causes her to have migraines and irritability.  Id. at 45.  She considers her physical problems to be worse than her mental problems.  Id. at 47-48.

Plaintiff received injections for pain in the cervical region and in her shoulder, which provide only limited relief.  Tr. at 42, 45-46.  Plaintiff testified that she underwent bariatric surgery two months before the hearing "to take like the pressure off my hips, and my knees and my feet," and that she went from 292 to 263 pounds during that time. Id. at 41.  She began taking Lyrica for headaches because gabepentin was "very sedating" and affected her balance, and that Lyrica works much better for her.  Id. at 36, 38, 39. She is going to look into getting occipital nerve block and another test for migraines.  Id. at 45.

Plaintiff testified that she can sit for ten minutes before she starts to feel pain, and that twenty minutes is "really rough."  Tr. at 54.  She feels "somewhat accomplished" with walking because she can walk for twenty minutes, take a five-minute break, and walk for twenty more minutes.  Id. at 54-55.  She drives to go shopping and take her son to school, but cannot drive for long distances because she gets sore from sitting.  Id. at 47.  She goes shopping but described getting confused and disoriented and having to buy smaller items, such as fifteen-pound bags of dog food, because she cannot lift and maneuver heavier amounts.  Id. at 52-53.  She texts on her cellphone and uses Facebook.

Id. at 55-56.  She relies on her partner for "everything," including things she used to

handle independently.  Id. at 66.[15]

     The ALJ also obtained testimony from a vocational expert ("VE").  Tr. at 70-78.

The VE testified that Plaintiff's past relevant work as a child psychologist was light and

skilled, and her work as a residential psychologist was sedentary, performed at light to

medium, and skilled.  Id. at 73.  The ALJ asked the VE to consider a hypothetical

individual of Plaintiff's age, education, and work experience who can lift five pounds

frequently and ten pounds occasionally, sit for six hours and stand/walk for four hours in

an eight-hour workday, cannot climb ladders, ropes, or scaffolds, but can occasionally

engage in other postural activities, requires ten-minute breaks every two hours, requires a

sit-stand option for two minutes every hour, can reach in all directions except overhead,

has fine and gross manipulation ninety percent on her dominant right side and sixty-five

percent on the left, is limited to occasional interaction with peers, the public or

supervisors but minimal supervision after thirty days on the job, must avoid heights and

dangerous machinery, and would be off-task twelve percent of the time and miss ten days

of work per year.  Id. at 74.  The VE responded that the limitations precluded Plaintiff's

---

     [15]Plaintiff's testimony is also largely consistent with a Function Report and
Supplemental Function Questionnaire she completed on February 13, 2016.  Tr. at 172-
79, 180-81.  She described her pain as "stabbing pain in left wrist, stiffness & duller but
more constant pain in left shoulder, stiffness & pain in neck, more on left which goes into
the jaw & temple, headaches in temples mostly [and] lumbar pain with sitting."  Id. at
180.  She experiences pain daily, triggered by her daily tasks, and obtains some relief
with standing and medication.  Id.  She listed several medications that she discontinued
because of lack of insurance.  Id. at 179.

past relevant work, but that other light work existed that such a person could perform, including photo counter clerk and garment sorter.  Id. at 74-75.

When the ALJ limited the hypothetical person to three hours of walking, the VE testified that the limitation would eliminate the light jobs she identified, but that there were sedentary jobs that such a person could perform, including document sorter and lens polisher.  Tr. at 75-76.  If Plaintiff missed twelve days per year, the VE testified that work would be precluded.  Id. at 77-77.  In response to questions from Plaintiff's counsel, the VE testified that work would also be precluded if the person were off-task fifteen percent or more of a workday.  Id. at 77.  Similarly, work would be precluded if the person's ability to look down with sustained flexion, look up while holding the head in a static position, and turn her head right and left was limited to one-third of the day.  Id.

### D.    Consideration of Plaintiff's Claims

#### 1.    ALJ's Consideration of Listing 1.04[16]

Plaintiff first argues that the ALJ improperly considered Listing 1.04, with respect to her neck injury.  Doc. 8 at 2-7; Doc. 10 at 1-2.  Defendant counters that the ALJ's consideration of the listings is supported by substantial evidence.  Doc. 9 at 3-8.

As previously explained, at step three of the five-step sequential evaluation, an ALJ must determine whether an impairment meets or equals the criteria of an impairment

---

[16]Although Plaintiff also criticizes the ALJ's findings with respect to Listing 1.02, she does not allege any harmful error and concedes that the ALJ's discussion of that listing "is of limited importance because section 1.02 is not the section of the Listings most pertinent to [Plaintiff's] physical impairments."  Doc. 8 at 4.  Similarly, Plaintiff does not allege any harmful error related to the ALJ's consideration of the mental health listings.

in the listings at 20 C.F.R. pt. 404, subpt. P., app. 1.  The listings are a regulatory device

used to streamline the decision-making process by identifying those claimants whose

medical impairments are so severe that they would be found disabled regardless of their

vocational background.  See 20 C.F.R. § 404.1525(a).  Plaintiff bears the burden of

showing that she meets a listing, see Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987),

and she must meet all of the specified medical criteria of the listing in question.  Sullivan

v. Zebley, 493 U.S. 521, 530 (1990).

Listing 1.04, entitled "Disorders of the spine," applies to spinal disorders

"resulting in compromise of a nerve root or the spinal cord," with:

> A.  Evidence of nerve root compression, characterized by
> neuro-anatomic distribution of pain, limitation of motion of
> the spine, motor loss (atrophy with associated muscle
> weakness or muscle weakness) accompanied by sensory or
> reflex loss and, if there is involvement of the lower back,
> positive straight leg raising test (sitting and supine); or
>
> B.  Spinal arachnoiditis, confirmed by an operative note or
> pathology report of tissue biopsy, or by appropriate medically
> acceptable imaging, manifested by severe burning or painful
> dysesthesia, resulting in the need for changes in position or
> posture more than once every 2 hours; or
>
> C.  Lumbar spinal stenosis resulting in pseudoclaudication,
> established by finding on appropriate medically acceptable
> imaging, manifested by chronic nonradicular pain and
> weakness, and resulting in inability to ambulate effectively. . .
> .

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04.  The ALJ addressed this listing as follows:

> The undersigned has considered [L]isting 1.04, but the
> evidence fails to demonstrate that this listing's criteria have
> been met.  To satisfy the requirements of this listing, a
> claimant must show compromise of the spinal cord or a nerve
> root that causes one of three groups of symptoms and/or

conditions within a 12-month period.  The first is a
combination of neuro-anatomic pain, limited range of motion,
muscle weakness, reflex loss, and positive straight-leg raising
test (if the lower back is involved).  In the alternative, there
must be evidence of spinal arachnoiditis (inflammation of the
arachnoid) causing severe pain resulting in the need to change
position or posture once every two hours.  This too has not
been met in this case, as the evidence does not show
arachnoiditis confirmed by tissue biopsy, operative note, or
appropriate imaging.  The third set of criteria involves
stenosis resulting in pseudoclaudication . . . which causes
pain and weakness and an extreme limitation in the ability to
walk, such that the person cannot travel without companion
assistance to and from a place of employment or school.  The
evidence in this [record] does not show that these symptoms
are met either, as [Plaintiff's] ability to walk is not so
severely compromised.

Tr. at 18.[17]  The ALJ subsequently presented a detailed narrative summary of the medical

and other evidence of record.  Id. at 22-24.

Plaintiff argues that the ALJ's step three determination is flawed because she

meets Listing 1.04A.  Specifically, Plaintiff argues that her pain is indisputably neuro-

anatomic, and she cites to instances in the medical record where treatment providers have

identified limitation of motion of the spine, muscle weakness, and sensory or reflex loss.

Doc. 8 at 6-7.  In the alternative, Plaintiff argues that even if she does not meet the

criteria of Listing 1.04A, the ALJ failed to address whether the combination of her neck

impairment and other impairments medically equals the listing.  Doc. 8 at 7; Doc. 10 at 2.

---

[17]As Plaintiff concedes, Doc. 8 at 4, Plaintiff does not have either arachnoiditis or
pseudoclaudication, and therefore Listings 1.04B & C are not relevant.  They are
included for purposes of comparing how the ALJ addressed each subsection of the listing.
Also, straight-leg test results are not necessary as Plaintiff does not allege lower back
involvement.  Id. at 6.

Plaintiff is correct insofar as the ALJ's discussion of Listing 1.04 is not a paragon of clarity.  For example, in the paragraph quoted above, the ALJ stated why Plaintiff failed to satisfy the criteria for sub-sections B and C, but merely stated that Plaintiff did not meet the criteria for Listing 1.04A, without providing an immediate explanation.  Tr. at 18.  Further, the ALJ's inclusion of the word "too" in relation to sub-section B suggests that an explanation had in fact been presented in relation to sub-section A.  Nevertheless, the Third Circuit has instructed that an ALJ's step-three finding must be read as part of the ALJ's decision as a whole, and that there is no requirement that an "ALJ use particular language or adhere to a particular format in conducting his analysis." Jones v. Barnhart, 364 F.3d 501, 504 (3d Cir. 2002).  In other words, a listing determination does not depend on the quality of the ALJ's sentence structure, but on whether the determination itself is supported by substantial evidence.

Here, the ALJ set forth the requirements of Listing 1.04A, including the requirement that the symptoms/conditions must be met within the same twelve-month period, and concluded that Plaintiff failed to meet the requirements.  The ALJ then presented a detailed chronological summary of the medical record in which the ALJ identified diagnostic studies and physical examination results related to Plaintiff's neck pain which did not fully satisfy the criteria for Listing 1.04A.  For example, the ALJ noted that there was no evidence of motor or sensory deficits in examinations conducted after Plaintiff's car accident in April 2015.  Tr. at 22.  The ALJ noted follow-up treatment "later that year" for reports of numbness, muscle spasm, weakness, and neck and back pain, with radiculopathy, a cervical MRI finding disc herniations and nerve root

displacement at C6-7, and physical assessments evidencing tenderness to palpation of the cervical and lumbar facets, and decreased sensation on the left side at C6-7. Id. (citing id. at 263, 285). However, the ALJ also noted a July 2015 nerve conduction study that found some chronic C6 root irritation, with no evidence of complications such as neuropathy, nerve entrapment, or myopathy, id. at 22 (citing id. at 555), and cited an examination performed by a pain specialist on September 25, 2015, during which Plaintiff exhibited tenderness in her neck and lower back and decreased sensation on the left side of C6-7, but also exhibited normal gait, full range of motion in her neck, 4/5 strength in her left biceps upon flexion, and 5/5 strength in all other muscle groups, including her left triceps. Id. at 22 (citing id. at 263).

The ALJ noted that during a neurology consultation in May 2016, Plaintiff reported "continued improvement with physical therapy," despite ongoing headache symptoms. Tr. at 23 (citing id. at 649). At this visit, Dr. Weinblatt found Plaintiff's cervical spine range of motion to be intact, her Spurling's test was negative, she exhibited normal left arm and hand strength, without atrophy, with "very mild weakness distally in the left hand" and decreased pinprick sensation in lower cervical dermatomes. Id. at 649. However, as the ALJ noted, even these mild findings were not present one month later when repeat nerve conduction testing was "considered to be normal showing no evidence of "myopathy, neuropathy, radiculopathy, or neuromuscular disorder." Id. at 23 (citing id. at 653).

Next, the ALJ referred to treatment records from late 2016 and early 2017 evidencing limited range of motion due to pain and some decreased sensation, as well as

records from the same period showing that her strength was generally intact and demonstrated a normal range of motion.  Tr. at 23.  For example, in November 2016 Plaintiff had some left-side weakness but otherwise her strength was intact, and she denied numbness and weakness in March 2017, when she presented with a normal range of motion.  Id. (citing id. at 959, 971).  Similarly, records from later in 2017 indicate that Plaintiff denied muscle pain and weakness when she sought treatment for headaches in July, see id. at 1289, and she exhibited full active range of motion in all planes, with mild strength deficits, in treatment notes from October and November.  See, e.g., id. at 1163 (09/01/17 – "near normal ROM and strength"), 1207 (11/07/17 – ROM "grossly [within normal limits] throughout all planes), 1392 (10/10/17 – Dr. Vasiuk noted normal ROM of Plaintiff's neck).

The ALJ noted that Plaintiff experienced acute shoulder pain after her dog pulled her leash during a walk in April 2018, with associated reduced range of motion, but she exhibited no strength deficits and intact cranial nerves, with no mention of sensory or reflex loss at that time.  Tr. at 23 (citing id. at 1257, 1260, 1290).  Finally, as pointed out by the ALJ, Plaintiff's primary care providers continued to report normal gait and normal range of neck motion.  Id. (citing id. at 1392 (10/11/17)); see also id. at 1437 (6/26/18), 1465 (7/13/18).

Read as whole, the medical evidence supports the ALJ's finding that Plaintiff failed to satisfy the criteria of Listing 1.04A.  Diagnostic studies and examination findings show the presence of a compromise of the spinal cord or a nerve root for at least part of the relevant period.  But the ALJ correctly explained that the condition must cause

a combination of neuro-anatomic pain, limited range of motion, muscle weakness, and reflex loss within a twelve-month period.  As the summary demonstrates, to the extent these symptoms appear in the record, they do not do so in combination and within a requisite twelve-month period as stated by the ALJ.

In her reply, Plaintiff argues that the Commissioner improperly relies on a "newly-minted" explanation for why Plaintiff fails to meet Listing 10.04A, namely that the listing's criteria must be met "simultaneously and continuously for twelve months."  Doc. 10 at 1, 2.  Plaintiff relies on Securities and Exchange Comm'n v. Chenery Corp., which requires that "[t]he grounds upon which an administrative order must be judged are those upon which the record discloses the action was based."  318 U.S. 80 (1943).  Plaintiff's argument is inapposite here.  The ALJ's opinion refers to Listing 1.04A's requirement that Plaintiff show compromise of the spinal cord or a nerve root that caused a combination of neuro-anatomic pain, limited range of motion, muscle weakness, and reflex loss within a twelve-month period, and the ALJ's summary of the medical evidence demonstrates that neither the combination of symptoms nor the twelve-month requirement were satisfied.  Tr. at 18, 22-24.  As such, Chenery does not apply.

In sum, the ALJ's paragraph addressing Listing 1.04 should not be read in isolation from the rest of the opinion.  Read in its entirety, the opinion provides adequate explanation for why Plaintiff's neck impairment did not meet or equal Listing 1.04A. Therefore, I find that the ALJ's step-three determination is supported by substantial evidence.

2.      <u>ALJ's Evaluation of Plaintiff's RFC</u>

Plaintiff also argues that the ALJ improperly evaluated Plaintiff's RFC.  Doc. 8 at 7-18; Doc. 10 at 1-2.  Defendant counters that the ALJ's RFC determination is supported by substantial evidence.  Doc. 9 at 8-24.

The RFC assessment is the most a claimant can do despite his limitations.  20 C.F.R. § 404.1545(a)(3).  In assessing a claimant's RFC, the ALJ must consider limitations and restrictions imposed by all of an individual's impairments, including those that are not severe.  20 C.F.R. § 404.1545(a)(2).  However, the ALJ is not required to include every impairment a clamant alleges.  <u>Rutherford</u>, 399 F.3d at 554.  Rather, the RFC "'must accurately portray' the claimant's impairments," meaning "those that are medically established," which "in turn means . . . a claimant's *credibly established limitations*."  <u>Id.</u> (emphasis in original) (quoting <u>Podedworny v. Harris</u>, 745 F.2d 210, 218 (3d Cir. 1984), and citing <u>Burns v. Barnhart</u>, 312 F.3d 113, 123 (3d Cir. 2002); <u>Plummer v. Apfel</u>, 186 F.3d 422, 431 (3d Cir. 1999)).  "In making the [RFC] determination, the ALJ must consider all evidence before him."  <u>Burnett v. Comm'r of Soc. Sec.</u>, 220 F.3d 112, 121 (3d Cir. 2000).

At the conclusion of the lengthy medical summary discussed in the previous section, the ALJ stated:

> These objective findings of [Plaintiff's] treating and examining sources do not support the severity of restrictions that [Plaintiff] has alleged. . . .  [S]he has a history of lumbar spine irregularities dating from prior to the alleged onset date, and updated clinical studies found no more than mild irregularities.  Gait, station, lower extremity strength, and ranges of motion all remained grossly normal.  Likewise, she has a history of treatment for symptoms of anxiety and

depression, but the record reflects no more than conservative and outpatient care. Mental status evaluations noted no evidence of acute thought content irregularities, and there is no evidence of a mental health hospitalization or a symptom exacerbation resulting in a loss of adaptive functioning for a period of extended duration.

As for the motor vehicle injuries and ongoing cervical spine irregularities, initial clinical studies from the time of the accident found no evidence of acute complication. A CT of [Plaintiff's] brain found no evidence of intracranial hemorrhage, infarct, mass, or mass effect. Follow-up studies found moderate cervical spondylosis and initial evidence of herniations at C3-C5, and C6-C7. Electrodiagnostic studies found initial support for some chronic C6 root irritation, but no evidence of a brachial plexopathy, peripheral neuropathy, nerve entrapment, or myopathy. However, treatment for her complaints of pain, numbness, and headaches has additionally remained entirely conservative, routine, and outpatient. There is no evidence of acute complications requiring hospitalization or further evaluation with a specialist. As noted above, [Plaintiff] reported good relief with her prescribed medications, and updated electrodiagnostic studies were considered to be normal. Gait, station, cranial nerves, sensation, and strength was [sic] all considered to be normal. Furthermore, in spite of her symptoms she retains at least some capacity to take care of some personal needs, prepare meals, load dishes, wash clothes, sweep, load wood into a wagon, vacuum, fold clothes, put away dishes, drive short distances, shop for groceries and personal items, handle her finances, read, operate a computer, maintain a Facebook account, operate a smart phone, paint, watch television, hike, listen to music/public radio, attend church, maintain activities for her son, and attend medical appointments. [Plaintiff's] statements regarding the severity of her limitations are not consistent with the adopted [RFC], because they are not supported by the grossly conservative and outpatient treatment history, the documented clinical and examination findings, and [Plaintiff's] stated ongoing capabilities.

Tr. at 24 (exhibit citations omitted).

Plaintiff alleges several flaws in the ALJ's consideration of Plaintiff's RFC.  For example, Plaintiff argues that the trigger point injections she underwent three times should not be characterized as "conservative treatment," and that the ALJ's mischaracterization undermines the RFC determination.  Doc. 8 at 12-13; Doc. 10 at 4-5.  Although injections are not the most conservative form of treatment, they are more conservative than many other forms, and they are certainly outpatient.  For example, when Plaintiff reported no relief from an injection, her pain specialist told her that she could "consider possible surgical options if she feels the symptoms would warrant it," tr. at 292, and her neurologist stated that "[i]ndications for spinal surgery would include intractable pain, severe neurological deficit or inability to carry out her normal lifestyle." Id. at 650.  I find no mischaracterization.  In any event, aside from the injections, Plaintiff's ongoing treatment consisted of chiropractic therapy, physical therapy, and pain medication -- in other words, conservative outpatient treatment.

Plaintiff also argues that the ALJ erroneously evaluated Plaintiff's subjective complaints in formulating the RFC determination, citing a regulatory provision providing that "we will not reject your statements about the intensity and persistence of your pain or other symptoms . . . solely because the available objective medical evidence does not substantiate your statements."  Doc. 8 at 12 (quoting 20 C.F.R. § 404.1529(c)(2)).  However, the ALJ did not base his RFC finding "solely" on the objective medical evidence, but also considered Plaintiff's course of treatment and her own reported activities of daily living.  Tr. at 20-25.  The ALJ stated that in spite of her limitations, Plaintiff indicated that she retained some capacity to take care of some personal needs,

perform household chores, drive short distances, shop for groceries and personal items, handle her finances, read, use a computer and smart phone, and attend church and medical appointments.  Id. at 24.  The ALJ also noted that Plaintiff walked her dog for up to forty-five minutes, three days per week, citing an exhibit dated January 2, 2018, see id., in which Plaintiff also stated that she was "independent with all" activities of daily living, and that she was "able to walk around Disney World for 12 hours with occasional seated rest breaks . . . without increase in pain or [symptoms]."  Id. at 1245.

Plaintiff also argues that the ALJ failed to explain his specific RFC findings that Plaintiff would be off-task for twelve percent of the time and would miss ten workdays per year.  Doc. 8 at 16; Doc. 10 at 6.  This argument finds its genesis in Doak v. Heckler, in which the Third Circuit held that the ALJ's decision that the plaintiff was able to perform light work was not supported by substantial evidence because "[n]o physician suggested that the activity [the plaintiff] could perform was consistent with the definition of light work."  790 F.2d 26, 29 (3d Cir. 1986).  Some courts interpreted Doak to require the ALJ to base his or her RFC determination on an opinion from a medical source.  See, e.g., Phillips v. Berryhill, Civ. No. 15-5024, 2017 WL 2224931, at *4 (E.D. Pa. May 22, 2017); Wright v. Colvin, Civ. No. 14-2350, 2016 WL 446876, at *16 (M.D. Pa. Jan. 14, 2016) ("the Third Circuit has continued to uphold the prohibition on lay reinterpretation of medical evidence, even when a state agency medical opinion indicates that the claimant is not disabled."), report and recommendation adopted, 2016 WL 452142 (M.D. Pa. Feb. 4, 2016).  However, Third Circuit opinions interpreting Doak indicate that this reading is too narrow.  For example, in Chandler v. Commissioner of Social Security, the

Third Circuit held that "the ALJ is not precluded from reaching RFC determinations without outside medical review of each fact incorporated into the decision."  667 F.3d 356, 362 (3d Cir. 2011).  Moreover, the Third Circuit has noted that "[t]here is no legal requirement that a physician [make] the particular findings that an ALJ adopts in the course of determining an RFC.  Surveying the medical evidence to craft an RFC is part of the ALJ's duties."  Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006) (not precedential).  As the Honorable Cynthia Rufe of this court more recently explained:

> Doak does not stand for the proposition that an ALJ cannot make an RFC determination in the absence of a medical opinion reaching the same conclusion.  Such a rule would be inconsistent [with] the Third Circuit's express holding that "[t]he ALJ – not treating or examining physicians or State agency consultants – must make the ultimate disability and RFC determinations."  Rather the court in Doak held that the ALJ's opinion was unsupported because nothing in the record, which consisted of testimony and three medical reports, justified the ALJ's conclusion.  Contrary to Plaintiff's contention, the more recent nonprecedential Third Circuit and district court opinions . . .  clarify, rather than contradict, Doak's holding, and make clear that an ALJ is not restricted to adopting the conclusions of a medical opinion in making an RFC determination.

Cleinow v. Berryhill, 311 F. Supp.3d 683, 685 (E.D. Pa. 2018) (footnote omitted) (quoting Chandler, 667 F.3d at 361, and citing Titterington, 174 F. App'x  at 11; Cummings v. Colvin, 129 F. Supp.3d 209, 215 (W.D. Pa. 2015) ("Doak does not, as Plaintiff suggests, hold that an ALJ's RFC findings must be based on a particular medical opinion . . ."); Callahan v. Colvin, Civ. No. 13-1634, 2014 WL 7408700, at *1 n.1 (W.D. Pa. Dec. 30, 2014) ("The Third Circuit did nothing more [in Doak] than make a substantial evidence finding in light of a limited record and did not purport to create a

rule that an RFC determination must be based on a specific medical opinion.").  Thus, the ALJ could properly find that Plaintiff would be off-task for twelve percent of the time and would be absent for ten days per year without a specific medical opinion to that effect.

Moreover, the finding is supported by the evidence of record.  For example, although Plaintiff experienced difficulties with her focus and attention after the car accident, she can engage in significant activities that require these abilities, including reading, watching television, and using a computer and cell phone.  And although she has a history of treatment for symptoms of anxiety and depression, she has received only conservative and outpatient care, and testified that she considers her physical problems to be worse than her mental problems.  Tr. at 47-48.

Plaintiff also argues that the ALJ failed to reasonably address Plaintiff's obesity.  Doc. 8 at 16-18; Doc. 10 at 7.  I disagree.  At step two, the ALJ listed obesity as one of Plaintiff's severe conditions.  Tr. at 17.  Next, the ALJ began his step-three discussion with the following:

> [Plaintiff's] obesity does not fall within the criteria of a listed impairment.  However, pursuant to Social Security Ruling 02-1p, it must be considered in conjunction with other related conditions.  [Plaintiff's] obesity and combined physical impairments do not effectively meet the requirements of any listing section in Appendix 1.  [Plaintiff] does not have joint major dysfunction characterized by gross anatomical deformity and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affects [sic] joints.  [She] does not have findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction or ankylosis of the affected joints.  There is not involvement of one major peripheral weight-bearing joint resulting in an inability to ambulate effectively, as defined in

> 1.00B2b.  Furthermore, there is not involvement of one major
> peripheral joint in each upper extremity resulting in an
> inability to perform fine and gross movements effectively, as
> defined in 1.00B2c.

Id. at 18.  The ALJ also mentioned Plaintiff's obesity when summarizing Plaintiff's

hearing testimony and the medical evidence.  For example, the ALJ noted that "[Plaintiff]

recently underwent bariatric surgery and has lost close to 60 pounds from her peak

weight," id. at 21, and that when she prepared for that surgery, "studies of her abdomen

found no acute abnormalities."  Id. at 23.  Thus, it cannot fairly be said that the ALJ

failed to discuss Plaintiff's obesity.

In arguing that the ALJ properly considered Plaintiff's obesity, the Commissioner

points to various aspects of the record that support the ALJ's finding that Plaintiff could

perform sedentary work despite her obesity.  Doc. 9 at 17-19.  For example, Plaintiff

performed sedentary work despite being obese prior to the car accident, she did not allege

that her neck or other injuries were exacerbated by her obesity, and she sought bariatric

surgery because "she would like to take care of herself," and not due to any allegedly

disabling functional limitation.  Id.  To these observations may be added the fact that no

medical treating source identified obesity as a disabling condition, by itself or in

combination with her other problems.  Once again, Plaintiff invokes Chenery, arguing

that Defendant cannot rely on such evidence because they were not relied upon by the

ALJ.  Doc. 10 at 7.  Even if those aspects of the record are ignored, however, the ALJ's

analysis withstands scrutiny.  As previously noted, the ALJ explicitly discussed other

aspects of the record which similarly support a finding that Plaintiff can perform

sedentary work despite her obesity.  These include her physical examination findings, her

physical therapy treatment notes and assessments, and her reported activities of daily living, including her ability to take multiple forty-five-minute walks per week with her dog.  Taken together, the evidence relied upon by the ALJ does not support a finding that obesity prevents Plaintiff from performing the identified sedentary work.

Finally, the objective evidence also supports the ALJ's RFC determination. Although Plaintiff exhibited decreased range of motion due to neck pain on several occasions, she exhibited no strength deficits in several examinations, see, e.g., tr. at 269, 272, 653, 959, 963, 1260, 1272, 1281-82, 1403, and on other occasions exhibited decreased strength only in her non-dominant left arm or hand.  Id. at 263, 314, 649, 683, 685, 698, 1094, 1110, 1140.  Similarly, Plaintiff exhibited no sensation deficits in several examinations, see id. at 340, 653, 1281, 1290, 1403, and on other occasions exhibited diminished sensation only in her left arm or hand.  See id. at 554, 959, 964.  As for Plaintiff's ability to sit, stand, walk, and perform postural activities, degenerative changes in Plaintiff's lower back were characterized as "mild," id. at 254, and she consistently exhibited a normal gait and station.  Id. at 263, 306, 504, 649, 663, 669, 961, 1081, 1403-04.  As for her lower extremities, Plaintiff exhibited normal strength, alignment and range of motion even with knee pain, id. at 1403-04, and she improved to 5/5 strength in her lower extremities following physical therapy.  Id. at 1245-46.

In sum, the ALJ reasonably found that Plaintiff could perform a range of sedentary work based on the objective medical evidence and her significant daily activities. Therefore, I conclude that the ALJ's RFC determination is supported by substantial evidence.

3.      Medical Opinion Evidence

Lastly, Plaintiff argues that the ALJ improperly failed to give controlling weight to the opinions of two treating physicians, Drs. Vasiuk and Spears.  Doc. 8 at 18-22; Doc. 10 at 7-8.  Defendant counters that the ALJ's consideration of the medical opinion evidence is supported by substantial evidence.  Doc. 9 at 20-24.

A treating physician's opinion is entitled to controlling weight when it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 404.1527(c)(2).[18]  A treating physician's opinion is entitled to greater weight than that of a physician who conducted a one-time examination of the claimant as a consultant. See, e.g., Adorno v. Shalala, 40 F.3d 43, 47-48 (3d. Cir. 1994) (citing Mason v. Shalala, 994 F.2d 1058, 1067 (3d. Cir. 1993)).  When there is a conflict in the evidence, the ALJ may choose which evidence to credit and which evidence not to credit, so long as he does not "reject evidence for no reason or for the wrong reason."  Rutherford, 399 F.3d at 554; Plummer, 86 F.3d at 429; see also 20 C.F.R. § 404.1527(c)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.").  When a treating physician's opinion is not accorded controlling weight, the ALJ should consider a number of factors in determining how much weight to give it

---

[18]Effective March 27, 2017, the Social Security Administration amended the rules regarding the evaluation of medical evidence, eliminating the assignment of weight to any medical opinion.  See Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844 (Jan. 18, 2017).  Because Plaintiff's applications were filed prior to the effective date of the new regulations, the opinion-weighing paradigm is applicable.

including the examining relationship (more weight accorded to an examining source), the

treatment relationship (including length and nature of the treatment relationship),

supportability, consistency, specialization, and other factors.  20 C.F.R. § 404.1527(c)(1)-

(6).

> Here, the ALJ stated the following about the medical opinion evidence at issue:

> > On August 14, 2018, Dr. Natalia Vasiuk . . . completed an
> > assessment of [Plaintiff's] functional capabilities for the
> > record and concluded that [Plaintiff's] pain would
> > consistently interfere with the attention and concentration
> > needed to perform even simple work tasks, and would render
> > her incapable of performing even low-stress jobs.  She opined
> > that [Plaintiff] could sit, stand, or walk no more than four
> > hours total in an eight hour workday, and walk no more than
> > 2 blocks without experiencing severe pain.  She was
> > prohibited from lifting any amount of weight, and she would
> > miss more than four days of work activity per month.  On
> > September 11, 2018, Dr. Roderick Spears completed a similar
> > assessment, characterizing [Plaintiff's] pain as occasional, but
> > still leaving her incapable of performing even low stress jobs.
> > Furthermore, he concluded that she could lift 10 pounds of
> > weight, but she could sit, stand, or walk for less than two
> > hours in an eight hour workday and she would miss four days
> > of work activity per month.  The undersigned gives both
> > assessments . . . limited weight, as overstatements of
> > [Plaintiff's] restrictions that are not entirely congruent with
> > the grossly conservative and outpatient treatment history, the
> > documented clinical findings noted above, and with
> > [Plaintiff's] stated ongoing capabilities, including her ability
> > to take 45 minute walks three times per week.

Tr. at 25 (exhibit citations omitted).

> Plaintiff is correct that, had the ALJ accepted the opinions of Drs. Vasiuk and

Spears, Plaintiff would have been found disabled.  Doc. 8 at 18-22; Doc. 10 at 7-8.

However, I conclude that the ALJ provided adequate explanation for not according great

or controlling weight to the opinions of these doctors.

First, the extreme limitations found by Drs. Vasiuk and Spears are inconsistent with the objective medical evidence.  The medical evidence and treatment history have already been discussed at length, and will not be repeated here.  However, it is worth noting that Plaintiff's diagnostic studies and physical examinations document an evolving and generally improving picture that belies the extreme functional limitations found by Drs. Vasiuk and Spears.  Similarly, Plaintiff's treatment history of injections, chiropractic and physical therapy, and medication management presents an overall picture of improvement in areas such as range of motion, muscle strength, and pain relief, which is also inconsistent with their extreme findings.  The extreme findings are also inconsistent with their own treatment records.  For example, Dr. Vasiuk completed her medical source statement containing extreme limitations on August 14, 2018, less than two months after an examination in which Plaintiff exhibited a normal range of motion in her neck, with no strength or other deficits, normal gait, and normal mood and affect.  Tr. at 1437. Similarly, Dr. Spears, who treated Plaintiff for headaches, found upon examination that Plaintiff exhibited normal gait and station, and normal muscle tone and muscle strength in her upper and lower extremities.  See, e.g., id. at 1290.

Second, the assessments made by Drs. Vasiuk and Spears are inconsistent with Plaintiff's own reported activities, as discussed at length while considering the first two claims.  Specifically, although Plaintiff claims that the ALJ unreasonably found that she could take forty-five-minute walks with her dog, three times per week, the record supports that finding.  Tr. at 25, 1475, 1483, 1485, 1493-94.  Additionally, as previously noted, Plaintiff reported that in February 2018, she was "able to walk around Disney

World for 12 hours with occasional seated rest breaks . . . without increase in pain or [symptoms]." Id. at 1245.

Finally, the doctors' opinions that Plaintiff would be unable to perform even low-stress work is not entitled to special weight because the issue of disability is reserved to the Commissioner. See 20 C.F.R. § 404.1527(d)(1) ("A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."); Social Security Ruling 96-5p, "Policy Interpretation Ruling titles II and XVI: Medical Source Opinions on Issues Reserved to the Commissioner," 1996 WL 374183, at *2 ("[T]reating source opinions on issues that are reserved to the Commissioner are never entitled to controlling weight or special significance.").

For these reasons, I conclude that this aspect of the ALJ's opinion is supported by substantial evidence.[19]

## V.   CONCLUSION

The ALJ's decision is supported by substantial evidence. The ALJ properly explained why Plaintiff did not meet Listing 1.04A, properly evaluated Plaintiff's RFC, and properly weighed the medical opinion evidence.

An appropriate Order follows.

---

[19]Because I affirm the ALJ's decision, it is not necessary to address Plaintiff's additional argument that the matter should be remanded with an award of benefits. See Doc. 8 at 23.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


| | | |
|---|---|---|
| THERESA COUNIHAN | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| ANDREW SAUL, Commissioner of | : | NO.  19-4884 |
| Social Security | : | |

## O R D E R

AND NOW, this 9th day of September 2020, upon consideration of Plaintiff's

request for review (Doc. 8), the response (Doc.9), and Plaintiff's reply (Doc. 10), and

after careful consideration of the administrative record (Doc. 7), IT IS HEREBY

ORDERED that:

1.    Judgment is entered AFFIRMING the decision of the Commissioner of
      Social Security; and

2.    The clerk of Court is hereby directed to mark this case closed.


BY THE COURT:

/s/ ELIZABETH T. HEY

_____

ELIZABETH T. HEY, U.S.M.J.